# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 19-86

**STATE IN THE INTEREST OF**

**Z. S. J.**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 2017-TP-21
HONORABLE JOHN C. DAVIDSON, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## D. KENT SAVOIE
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and D. Kent Savoie, Judges.

**REVERSED AND RENDERED.**

**Guy R. Lain**
**Louisiana Department of Children and Family Services**
**1721 Carter Street**
**Vidalia, LA 71373**
**(318)336-8611**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana, Department of Child and Family Services**

**Malcolm Xerxes Larvadain**
**Attorney at Law**
**626 8th St.**
**Alexandria, LA 71301**
**(318) 445-3533**
**COUNSEL FOR OTHER APPELLEE:**
    **J.M. (father)**

**Zebulon M. Winstead**
**3416 North Blvd.**
**Alexandria, LA 71301**
**(318) 445-1488**
**COUNSEL FOR OTHER APPELLEE:**
    **Z.S.J. (child)**

**Tiffany N. Sanders**
**Attorney at Law**
**929 Johnston Street**
**Alexandria,, LA 71301**
**(318) 443-9080**
**COUNSEL FOR APPELLANT:**
    **T.J. (mother)**

**Jane Hogan**
**310 North Cherry St.**
**Hammond, LA 70401**
**(985) 542-7730**
**COUNSEL FOR APPELLANT:**
    **T.J. (mother)**

**SAVOIE, Judge.**

The mother, T.J.,[1] appeals a judgment terminating her parental rights with respect to her biological son, Z.S.J., for failure to substantially comply with her case plans as contemplated by La.Ch.Code art. 1015(6). Specifically, the trial court found noncompliance with the case plans' requirements concerning financial support, visitation, and, as stated by the trial court, "[t]raining to care for her special needs child."

On appeal, T.J. argues that reversal is appropriate, focusing her arguments on a failure to communicate on the part of the two State offices handling this matter – the Alexandria office, who oversaw the case with respect to T.J., and the Shreveport office, who oversaw the case with respect to Z.S.J. We agree. The record is replete with evidence showing lack of communication and organization between these two offices, to the detriment of T.J. and the child. Therefore, for this reason, as well as the reasons discussed more fully herein, we reverse the ruling of the trial court and dismiss the State's petition for termination of parental rights against T.J.

## FACTUAL AND PROCEDURAL BACKGROUND

In June 2009, Z.S.J. was born prematurely with hydrocephalus and other medical complications including cerebral palsy and seizures that required specialized treatment. Z.S.J. was T.J.'s fourth child. Following his birth, Z.S.J. spent four months in the neonatal intensive care unit at a hospital in Alexandria and was thereafter transferred to Holy Angels, a residential facility in Shreveport.

---

[1] Initials of the parties are used in this matter pursuant to Uniform Rules, Courts of Appeal – Rules 5-1 and 5-2.

In October 2009, before Z.S.J. was transferred to Shreveport, the State of Louisiana, through the Department of Social Services ("the State"), sought and obtained an instanter order removing Z.S.J. from the care of his parents. Removal was based upon the following allegations:

> On October 14th, 2009[,] the agency received a report of medical neglect . . . stating that [Z.S.J.] . . . is ready for discharge to Holy Angels Residential Facility in Shreveport, Louisiana. . . . [T.J.] and [J.M.[2]] want to take the child to their home, which is against medical advise [sic]. According to Dr. Shroeder, due the child's special needs, [Z.S.J.] cannot be taken care of in a traditional home. . . . [T.J.] and [J.M] are refusing placement.

A continued custody hearing was held October 22, 2009, after which the trial court rendered an order finding that continued custody with the State was necessary and noting the "child is medically fragile and unable to be in the parent's home[.]"

On November 3, 2009, the State filed a petition seeking to adjudicate Z.S.J. a child in need of care.[3] An adjudication hearing was held January 7, 2010, after which the trial court rendered a stipulated judgment adjudicating the child in need of care.

Review and/or permanency hearings were held approximately every six months, at which time the trial court approved the case plans submitted by the State. The case plan goal remained reunification until April 2017, and then was changed to adoption. After each hearing, the trial court maintained Z.S.J.'s placement and custody with the State. Z.S.J. was initially placed at Holy Angels in Shreveport until July 2, 2012, and then he was placed into the specialized foster home of E.S., who resided in Shreveport. In December of 2012, Z.S.J. was placed into the specialized

---

[2] J.M. is Z.S.J.'s biological father. His parental rights were also terminated; however, he has not appealed.

[3] The entire record from the Child In Need of Care ("CINC") proceedings, bearing trial court docket number 09-CC-80, was accepted as evidence in connection with the instant termination proceeding without objection.

foster home of Y.D., who also lived in Shreveport, and was a nurse who formerly cared for Z.S.J. at Holy Angels. Z.S.J. remained in Y.D.'s home through the subject termination proceedings in September 2018.

In approximately March 2010, the State's office in Shreveport was assigned Z.S.J.'s case, while the State's office in Grant Parish, and then in Alexandria, oversaw the case with respect to T.J., who lived in Alexandria. Ms. Silviera Hunt was the caseworker in the Shreveport office beginning in March 2010 and continued to be the caseworker through the termination hearing, with the exception of October 2013 through approximately June 2014. Ms. Shantelle Lockwood was initially T.J.'s caseworker in the Alexandria office, followed by Ms. Ebony Simmons, Ms. Leatrice Williams, and then Ms. Heather Carpenter. Ms. Carpenter began handling T.J.'s case in November 2016 and did so through the September 2018 termination hearing.

The earliest case plan in the record is dated October 5, 2010. Z.S.J. was placed at the Holy Angels facility in Shreveport at this time. The case plan's goal was reunification. It required T.J. to maintain a safe and stable home, obtain employment or demonstrate an ability to financially provide for the needs of her children, remain in contact with the State, develop a support system, apply for appropriate financial assistance, and provide either $10 per month or $25 per month in support depending on whether she was employed. The case plan also indicated that the State would transport T.J. from Alexandria to Shreveport monthly to visit Z.S.J. A similar case plan dated March 2011 was approved by the trial court in April 2011.

A case plan dated September 2012, as well as a case plan dated March 2013, noted T.J.'s general progress. They noted compliance with and/or completion of case plan goals and recognized T.J.'s bond with Z.S.J. They further provided for

3

monthly visitation to alternate between Bossier City and Alexandria following Z.S.J.'s transition from Holy Angels in July 2012, and otherwise maintained the same general goals and action steps as the previous case plans.

In connection with the April 2013 review hearing, the trial court ordered the State to assist T.J. with weekly counseling sessions, which, according to the State would assist T.J. in addressing the comprehensive care needed for Z.S.J. A case status report requested from the State by the trial court dated June 3, 2013, indicated that T.J. began counseling with Michelle Redding on April 17, 2013, completed five sessions, and was cooperative. It further reflected that T.J. attended medical appointments and therapy with Z.S.J. as requested, that supervised visits were alternated monthly between Bossier City and Alexandria, and that Z.S.J. saw his mother weekly at therapy in addition to the monthly visits.

A September 19, 2013 case plan, which provided similar goals and action steps as the previous plans, was approved at the October 2013 review hearing. The plan also reflected that the State would transport T.J. every Monday to Shreveport for visits, counseling, and physical therapy appointments. The case plan also indicated that the State was

> not pursuing termination of parental rights due to T.J.'s completion of case plan goals and her bond with Z.S.J. Due to his medical needs [Z.S.J.] is unable to return home at this time. . . . He will need life long medical care. [Z.S.J.] is currently placed in a specialized home where he is receiving 24 hour care.

The State also submitted a written report from Ms. Redding recommending that T.J. "have extended responsibilities with Z.S.J. and extended visitation times . . . prior to his return home to ensure her ability to parent and protect [Z.S.J.] as well as her additional children." The report further reflected that during the sessions, T.J. interacted well with Z.S.J., and during one session Z.S.J. was heard saying "momma."

4

In connection with the October 2013 hearing, the State also submitted an uncertified letter dated September 26, 2013, from Dr. Christina Notarianni, stating that she was Z.S.J.'s pediatric neurosurgeon, that "his specific neurological conditions cannot be handled in Alexandria, as the neurosurgeons in that city do not treat pediatric patients," and requesting that Z.S.J.'s residence remain in Shreveport "so he can stay current on his therapy and receive all of the specialized medical care that he requires for his numerous chronic medical conditions."

In the fall of 2013, T.J. became pregnant with her fifth child and suffered complications during the pregnancy, which affected her ability to travel to Shreveport for visitations, counseling, and appointments. The child was born in or around May 2014 and has developmental delays.

At the next review hearing in April 2014, the State submitted a case plan dated March 6, 2014, with a goal of reunification and a secondary goal of alternative permanent living arrangement ("APLA"). It further reflected that the State was not pursuing termination of T.J.'s parental rights in light of her completion of case plan goals and bond with Z.S.J. The March 2014 plan also noted that T.J. had space in her home for all of her children, including Z.S.J., and that she provided for the basic needs of her children; however, she did not attend all of Z.S.J.'s appointments in Shreveport due to her high risk pregnancy and her doctor being in New Orleans. The plan also stated that

> Based on the decision made by Judge Johnson[4] the agency is no longer required to provide [T.J.]'s transportation weekly to Shreveport. The agency was instructed to provide [T.J.] with one supervised visit monthly and she would need to prove her own transportation to the remainder visits. The Agency will provide transportation for [T.J.] to Shreveport on the 3rd Thursday of each month to visit with [Z.S.J.]. . . .

---

[4] This decision does not appear in the record.

Ms. Jackson will need to provide her own transportation to the visit the first of the month.

The next review hearing was held October 6, 2014. In connection therewith, the State's office in Alexandria filed a report dated October 2, 2014, noting that the primary goal remained reunification, and stating as follows:

During this past 6 months, she has not been able to attend appointments due to her own high risk pregnancy and birth of another child. This child . . . also has special needs and is developmentally delayed. . . . [T.J.] has kept all appointments regarding [this child]. [T.J.] and [Z.S.J.] have not attended weekly counseling sessions with Ms. Michelle Redding in Shreveport this past 6 months . . . . She has followed the recommendations of our agency providers by demonstrating appropriate parenting skills during visits with [Z.S.J.], however she has just started visiting with [Z.S.J.] again effective August, 2014, due to her high risk pregnancy. . . .

However, despite T.J.'s noted difficulties in progressing with respect to the case plan goals, a case plan dated September 25, 2014, and submitted to the trial court in connection with the October 2014 review hearing, reflected that the State "is not pursuing termination of parental rights due to [T.J.]'s completion of case plan goals and bond with [Z.S.J.]" The case plan goal remained as reunification with a secondary goal of APLA. The case plan also noted that that "[s]ince giving birth to her son in May, she has attended visit[s] set up by the agency in August and September[,]" but T.J. had not provided any proof of child support payment over the past 6 months. In addition, the plan stated that T.J. "will receive information from [Z.S.J.]'s foster parent on how she might prepare for unexpected situations (e.g. emergency situation with [Z.S.J.]" The visitation schedule remained the same as stated in the prior case plan: "The Agency will provide transportation for [T.J.] to Shreveport on the 3rd Thursday of each month to visit with [Z.S.J.]. . . . [T.J.] will need to provide her own transportation to the visit the first of the month." The visits were to occur at Ms. Redding's office in Shreveport.

6

In connection with the next review hearing held on April 13, 2015, the State's office in Alexandria submitted a report noting that within the last six months, T.J. had maintained a safe and stable home, had supervised visits with Z.S.J., and had developed a "healthy relationship" with him. The report further stated:

> [T.J.] has completed the agency case plan goals and objectives during this six month planning period. She has maintained safe and stable housing, obtained medical care for her children as needed and has attended all scheduled medical appointments, she has ensured that the children attend school daily and has all their needed supplies. . . . Agency recommends that [Z.S.J.] continues to remain in state's custody due to medical staff reporting a continued need for him to remain in Shreveport, LA to receive on-going quality medical care.

A case plan dated March 23, 2015, was also submitted. It reflected that the State was not pursuing termination of T.J.'s rights due to her "completion of case plan goals and her bond with Z.S.J[.]" It further noted that T.J. has provided Z.S.J. with clothing during family visits; she "has become very familiar with community resources in this area and is familiar on how to access assistance and services from other community providers if needed[;]" and "her home is always neat and clean and she has sufficient clothing and food." No specific visitation plan or schedule was provided in the March 2015 case plan. However, a subsequent case plan from September 2015 stated "at the last hearing dated April 13, 2015[, T.J.] was allowed to have unsupervised visits with [Z.S.J.] that would be coordinated through the agency workers. These visits would also be coordinated with the caretaker as well."

Following the hearing, the trial court rendered a judgment approving the case plan and further stating that T.J. was "complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child(ren) to be in care."

The next review hearing was held October 12, 2015. In connection therewith, the State submitted a report noting that T.J. was able to visit with Z.S.J. once during the six-month reporting period, coordinated and attended a birthday party for him in Bossier City, and attempted to visit several other times but was not able to do so because of her contacting the State "at such a late notice." It further reported T.J. "has completed the agency case plan goals during this six months case planning period[,]" exhibited proper parenting skills, and provided appropriate care for her other special-needs son. It also stated that her children

> are very bonded to one another and the mother as well . . . and they always question their brother's [Z.S.J.'s] return to the home and express how much they miss him. . . . [T.J.] has matured since [Z.S.J.]'s entrance into foster care . . . . [and] ha[s] made tremendous progress in the area of decision making.

A case plan dated September 23, 2015, was also submitted to the trial court. It reflected that T.J. and her other children desired to have Z.S.J. placed in their home, T.J. has been allowed to have unsupervised visits, and T.J. has "mature[d] since [Z.S.J.'s] entrance in foster care. . . . [S]he ha[s] made tremendous progress in the area of decision making." The plan also noted that T.J. "has not paid [] parental contributions but during visits she often provides the caretaker with clothing in which she has purchased for him. She shows agency worker items in which she has purchased for him during monthly in home visits." No specific visitation schedule was provided, but rather the plan indicated that visits would be coordinated through the State's agency workers and the foster parent.

A report from the Court Appointed Special Advocate ("CASA") representing the child was also submitted to the trial court in connection with the October 12, 2015 hearing. It reflected that Z.S.J. was in first grade and doing well. It stated that T.J.

8

continues to remain very active in her DCFS case plan work. . . . The Caddo DCFS office now supervises [Z.S.J.]'s case plan and during the FTC stated that their office does not concur with Rapides['] decision to change goal to APLA. Caddo supervisor Kamisha Bankston stated that APLA is not an appropriate goal for a six year old[.]

Following the October 12, 2015 review hearing, the trial court rendered a judgment approving the case plan and stating that the "child must be medically stable for a min[imum] of 12 months before any thought of placement change."

The next review hearing was held March 28, 2016. A case plan dated March 18, 2016, was submitted and again indicated that the State was not pursuing termination of rights due to T.J.'s completion of case plan goals and bond with Z.S.J. The plan indicated that T.J. had one visit with Z.S.J. during the reporting period. It also established a visitation plan indicating that T.J. would visit on the third Wednesday of each month at a McDonald's in Shreveport.

The March 2016 case plan also added for the first time the following as a specific behavioral goal: "Increase the knowledge of the care of [Z.S.J.]'s needs and to encourage an on-going mother son relationship[.]" In connection with that goal, the plan included the following action step, which provided responsibilities for both T.J. and the State:

> [T.J.] will attend all medical appointments involving [Z.S.J.] She will be notified in advance of all scheduled appointments so that she can coordinate child care arrangements for the other children in her care. She will also be informed of any emergency related procedures in a timely manner and will be allowed to discuss medical issues along with the care of [Z.S.J.] through medical visits. [T.J.] will also be available to attend scheduled visits with [Z.S.J.] If she is unable to attend any visits agency worker will notify Caddo Parish of her inability to attend in a timely manner.

An uncertified letter from Dr. Notarianni, Z.S.J.'s neurologist, dated March 23, 2016, was filed into the CINC record in connection with the April 2016 hearing. It reflected that Z.S.J. had made "remarkable progress since he was last seen last

9

year and is able to talk some now . . . . He has benefited from being here in Shreveport with physicians who know him so well. . . . and [we] request that you leave him in his present home."

The next review hearing was held October 14, 2016. The State's report from the Alexandria office reflected that T.J. had attended a majority of Z.S.J.'s medical appointments and scheduled visits. A case plan dated September 21, 2016, was also submitted. It stated that termination of parental rights was not being pursued and that T.J. continued to comply with her case plan goals. The plan does not contain any information regarding a visitation plan or schedule. While the Alexandria office's report stated that it was waiting for a weekly visitation agreement from the Shreveport office, no such agreement appears in the record. The September 2016 case plan also maintained the action step stated in the prior case plan concerning T.J.'s and the State's responsibilities with respect to medical appointments, and it added the following additional action step, which also provided responsibilities for both T.J. and the State:

> [T.J.] will gain medical knowledge into learning how to maintain [Z.S.J.]'s PEG tube and demonstrate these skills learned through visits. She will also learn [Z.S.J.]'s medical needs, daily medications, favorite foods and daily schedule. Agency worker will discuss if current foster parent . . . is able to provide this information to [T.J.] Agency worker will seek out resources who are able to demonstrate additional medical knowledge that [T.J.] may need to properly care for [Z.S.J.]

In November 2016, T.J. gave birth to her sixth child following another high risk pregnancy. This child was born with severe respiratory disease, brain bleeding, and associated disabilities. As a result, T.J. was placed on medical restrictions through January 2017, which hindered her ability to visit with Z.S.J. or otherwise attend his medical appointments.

10

The next review hearing was held April 10, 2017, after which the case plan goal was changed from reunification to adoption. A case plan dated March 16, 2017, was submitted and approved by the trial court. The case plan reflected the new goal of adoption. It stated that during the previous six-month period, during which T.J. was on medical restrictions for her high risk pregnancy, T.J. visited with Z.S.J. once and

> there was another attempt to, but Shreveport DCFS worker did not have him available to do so. [T]here were 9 total visits to have.[5] The agency provided transportation on several dates. Most visits were cancelled by mother, due to her other children being sick or having a medical appointment, employment reasons or miscommunication. [T.J.] gave birth to her sixth child . . . who is special needs and remained in NICU for several weeks following birth. She was then placed on travel restriction, that was lifted and she was released by her doctor to travel in early January 2017. Visits between [T.J.] and her son, [Z.S.J.] began again January 12, 2017, and every Thursday thereafter.

The March 2017 plan also stated that T.J. was "invited to attend a number of [Z.S.J.]'s medical appointments, as well as his IEP update meeting" but that she did "not make herself available for these appointments or meetings, except for the one attempt she made to attend a pre-op appointment that she was several hours late for." It is unclear whether these appointments or meetings took place before or after her medical release in January 2017. The plan also noted that T.J. wanted to be able to directly contact the foster parent, Y.D, but that Y.D. would not allow her to do so, and that T.J. wanted "to be updated better on her son's care, and be notified in advance of his medical appointments so she can make appropriate arrangements."

---

[5] We note that the previous case plan from September 2016 case plan did not contain a specific visitation schedule. While the Alexandria office's report noted it was awaiting a weekly visitation contract, no such contract is in the record or otherwise appears to have been approved by the trial court. Therefore, it is unclear when the referenced nine visits were to have taken place, or what efforts the State made in coordinating them, as required by the case plan.

Three somewhat conflicting visitation plans were attached to the multiple March 2017 case plans filed in the record. One stated that the State and foster parents provide transportation to the family visits and T.J. "continues to visit with [Z.S.J.] when she can." Another stated that weekly visits would occur on Thursdays at the Shreveport office and that the State or T.J. would provide transportation to and from the visits. The other visitation plan stated that weekly visits would occur on Thursdays for one hour at the Shreveport office, the State would provide transportation if given 72-hours notice, and T.J. "is encouraged to attend all medical appointments . . . as well as any other meeting that occurs regarding her son's care and educational needs . . . in addition to weekly scheduled visits." It further stated that the foster parent, Y.D., was "to be present to update [T.J.] of [Z.S.J.'s] medical, educational, and every day needs and his overall well-being. [Y.D.] is to be supportive of reunification[,]" but she "is not comfortable being in direct contact with [T.J.]"

The March 2017 case plan's behavior goals and action steps differ from the March 2016 and September 2016 case plans in that it did not provide the specific paragraphs defining T.J.'s and the State's responsibilities with respect to medical appointments or T.J.'s obtaining medical knowledge. Rather it added new action steps or rephrased others in general terms. The case plan reflected that T.J. was required to, *and had successfully*, maintained a suitable home, obtained employment or otherwise showed an ability to financially provide for her children, applied for appropriate financial assistance, provided $10 or $25 per month in support depending on employment, and demonstrated appropriate anger management skills.

An action step marked incomplete required T.J. to "develop a support system . . . to request help as necessary to provide for her child's safety, medical,

physical, emotional, and educational needs." However, the plan also stated that T.J. "appears to be resourceful, in that she knows who her community resources are and how to use them. [T.J.] has . . . expressed defeat because of not being given a chance to raise [Z.S.J.] She is capable of expressing these emotions in a healthy way, and has learned to be more mature in nature."

Another action step noted as incomplete generally required T.J. to "continue to exhibit appropriate parenting skills," with no further explanation or direction. With respect thereto, the plan reported that T.J.

> Demonstrates the ability to love and nurture her children. . . . She is very protective of the children and has knowledge in the area of child development. She provides appropriate care for [her sixth child] which is a special needs child. . . . The children are very bonded to another and the mother as well as during monthly visits they always question their brother's [Z.S.J.]'s return to the home. The oldest child . . . is very helpful to the mother. . . . [T.J.] has matured since [Z.S.J.]'s entrance in foster care. . . .

> . . . . She has presented items she wants to give to the child, but has not been successful in this. . . . [T.J.] appears to have a full plate with raising five children in her home, two with special needs, the other active in counseling. She has added to this plate throughout the case planning processes, and does not understand what is fully needed to accurately provide 24 hour care to [Z.S.J.] She does express care and concern toward her son, but has not demonstrated this in actions, just words. [T.J.] has not attended his medical appointments, surgeries, or family visits with [Z.S.J.], on a consistent basis.

The March 2017 case plan also reported the following comments were made by T.J.:

> [T.J.] does not feel she has been given adequate and appropriate opportunities to learn how to properly care for [Z.S.J.]'s medical needs. Although she has been invited to medical appointments to learn, (she has not attended on a consistent basis) and feels she has not been given the opportunity to provide that kind of care in a realistic situation. . . . She admits to being immature in the beginning, but believes she has matured in many ways and is very capable of raising her son . . . . [T.J.] does not feel supported by DCFS, especially the worker for [Z.S.J.], and is unwilling to voluntarily surrender her rights to him, because she does not want to do so. She loves her son and does express that.

On August 31, 2017, the State instituted the termination proceeding at issue here, which was separate from the CINC proceeding. The State's Petition seeking termination alleged that T.J. "failed and/or refused to adequately participate in the services provided to [her]; and/or ha[s] failed/refused to substantially comply with the case plans for services . . . and there is no reasonable expectation of significant improvement in the parents' condition or conduct in the near future[.]" The Petition also alleged that T.J. failed to provide significant financial contributions and has not had significant contact with him by for a period of six consecutive months.

The next review hearing was held October 10, 2017. A case plan finalized September 20, 2017, was filed in connection therewith. The attached visitation plan stated that visitation was once per month at the Shreveport office, "as per the goal of adoption[,]" and that T.J. was encouraged to reach out to the foster parent regarding Z.S.J.'s care. The visitation plan also noted that transportation was available upon 72-hour notice, but T.J. was expected to use her own transportation when State transportation was not available to transport her to medical appointments and visits. It further stated that T.J. and the foster parent "are encouraged to communicate between each other, via telephone, social media, and U.S. mail, as much as possible."

The September 2017 case plan also reported that there were no face-to-face visits in May, June, or July, but that T.J. had visited with Z.S.J. in April 2017 at the hospital when he was undergoing rehabilitation services following a surgery. It also indicated that T.J. visited with Z.S.J. in August 2017, and on the way to the visit, made phone calls to Z.S.J.'s doctors and obtained two future appointments. The

14

plan reflected that interaction between Z.S.J. and T.J. was appropriate and went well. It stated

> She was attentive to his needs. . . . She laughed with him and assisted him with coloring . . . . Mother spoke to him about his siblings and other family members. [Z.S.J.] blew kisses and gave hugs to his mother. Mother suggested they facetime/call [Z.S.J.'s] grandmother. [Z.S.J.] appeared to recognize this family member as he called her by name.

The plan also reported that during the August 2017 visit, T.J. and the foster parent discussed some areas regarding Z.S.J., and that T.J. provided a school book bag, lunch box, and tennis shoes for Z.S.J.

The September 2017 case plan reinserted the action step pertaining to T.J.'s and the State's responsibilities regarding medical appointments, which was included in March 2016 and September 2016 case plans. It stated that T.J. was required to participate in one family visit per month, which would be scheduled by the Shreveport office and that transportation would be provided. The plan also reinserted the action step regarding T.J.'s and the State's responsibilities regarding medical knowledge and training concerning Z.S.J.'s PEG tube and other needs, which were included in the September 2016 case plan. It further reported that T.J. had not paid any child support, been available to meet with the agency worker monthly, attended all of Z.S.J.'s medical appointments and visitations, or gained medical knowledge involving the daily care of her son. Specific information concerning the visitations and appointments missed was not provided.

The next review hearing was April 9, 2018. The State's office in Shreveport submitted a report noting Z.S.J. was in third grade in an adaptive classroom and doing well, and he "is very alert and capable of holding a conversation and retaining information." The State's office in Alexandria also filed a report with the trial court stating:

15

During this last 6 month reporting period there were 6 scheduled family visits. Of those 6 visits, 4 were attempted by [T.J.] **and the child was not available, per Shreveport DCFS**. . . . The Alexandria office provided transportation for [T.J.] a number of times this period; she utilized them all; however on four separate occasions, [Z.S.J.] was not available for scheduled visits.

. . . .

During the visit in August and November 2017, [T.J.] provided attention towards her son, as well as affection. . . . [Z.S.J.] appeared to enjoy these activities, as well as his mother's company. **During the months of Sept., Oct., Dec., and before court in February 2018, attempts were made to visit with [Z.S.J.]; however, he was not made available**.

(emphasis added).

The report also indicated that the Alexandria office was made aware of a medical appointment that occurred during the reporting period, but that notice was received on the same day of the appointment, which was also the date of a family team meeting. In addition, the report stated:

During this reporting period, this agency worker has had better contact with [T.J.] . . . [T.J.] states she loves her son and wants to fight for custody of him. [T.J.] states she is not being informed in adequate time to prepare to attend appointments and this has been quite frustrating to her.

. . . .

[T.J.] has maintained her visits in the home with the agency worker. She is requesting the agency refer her for an educational class to be better informed of [Z.S.J.]'s medical needs. The Alexandria office has spoken with [Z.S.J.]'s pediatrician . . . regarding an "educational" session for [T.J.], but was informed that the required "education" that she will need to care for [Z.S.J.] 24/7 would entail: managing his daily/nightly toileting accidents, seizure care and recognition, peg tube care with feeding and medication implementation, ongoing physical therapy, and wheel chair management; and required more than just an "education meeting, but more of a day to day practice of.

. . . .

During this period, contact with [T.J.] has improved and more home visits have been completed . . . . [T.J.] is doing her best with

16

managing being a single mother to five children. She has learned to utilize her support team more[.]

. . . .

[T.J.] expresses love and wants to care for her son, [Z.S.J]; however, **she has never had him in her immediate care or reach to provide the daily practice and be educated on what it takes to care for his medical needs**. This is of great concern, as [T.J.]'s ability to be able to provide a safe and adequate home to him has not been accurately represented thus far.

(emphasis added).

A case plan dated February 23, 2018, was also submitted to the trial court. It noted that T.J. "came into the meeting feeling encouraged, but left the meeting discouraged, and stated she was fighting a losing battle." It reported that T.J. visited once during the reporting period, but on four other occasions, Z.S.J. was not made available for visits. It also noted T.J. was behind in support, but also that she brought items for [Z.S.J.] during the scheduled visits but was not able to give them to him since he was not made available. The plan also reported that T.J. attended family team meetings and hearings and kept the State aware of her whereabouts and significant changes. The attached monthly visitation plan was similar to the visitation plan submitted with the previous period's case plan.

The February 2018 case plan reflected that action steps regarding providing support, attending and coordinating medical appointments, and gaining medical knowledge concerning Z.S.J.'s care were incomplete. The case plan also stated:

T.J. has not made any medical appointments for [Z.S.J.] this period, **as we were notified none occurred** . . . . [T.J.] has, on her own, attempted to gain access to Z.S.J.'s medical records and updates of his medical care, but has not been able to receive the information. She has also tried to enroll in some sort of education class regarding caring for a PEG tube, but has not had much success of this.

(emphasis added).

17

A hearing on the State's petition seeking the termination of T.J.'s parental rights was held August 27, 2018, and September 7, 2018. The entire CINC record was accepted into evidence without objection, and the trial court heard testimony from T.J., Ms. Hunt, and Ms. Carpenter. No medical evidence was submitted concerning Z.S.J.'s medical condition or medical needs at the time of the hearing.

Following the hearing, the trial court signed an order terminating T.J.'s parental rights and certifying Z.S.J. as eligible for adoption. In its written reasons for ruling, the trial court found that T.J. "completed some components of her case plan, specifically, housing, income and domestic violence training" and also the mental health assessment; however, T.J. "did not complete" parental support, visitation, or "[t]raining to care for her special needs child." Therefore, according to the trial court, the State "proved by a clear and convincing standard that [T.J.] did not substantially comply with her case plan. The case is nine years old. There is no reasonable expectation for improvement."

The trial court also noted Z.S.J.'s attorney's position was "in favor of termination if the grounds were proved by [the State]," and the trial court ultimately concluded that "[i]t is in [Z.S.J.]'s best interest to remain in his current stable, living environment and that [T.J.]'s parental rights be terminated. [T.J.] has not demonstrated that she can provide the care [Z.S.J.] requires to live and thrive. . . . Termination is in [Z.S.J.'s] best interest so that he can establish secure, stable, long-term and continuous relationships found in a home with proper parental care."

T.J. appeals. On appeal, she asserts the following as assignments of error:

1. The juvenile court manifestly erred by finding clear and convincing evidence that T.J. had not substantially complied with her case plan, that DCFS provided reasonable efforts to assist T.J. to complete her case plan, and that there was no reasonable expectation of T.J.'s significant improvement in the near future.

2. The juvenile court manifestly erred by finding that the State proved by clear and convincing evidence that termination of T.J.'s parental rights was in the best interest of Z.[S.]J.

## ANALYSIS

"The liberty interest in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000). "In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id.*

> The State's *parens patriae* power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. **The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated**. LA. CHILD. CODE art. 1001. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration.

*State ex rel. J.A.*, 99-2905 (La.1/12/00), 752 So.2d 806, 811-12 (cites omitted)(emphasis added).

Louisiana Children's Code Article 1015 provides various grounds for the termination of parental rights, including the following, upon which T.J.'s rights were terminated:

> (6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

With respect to a parent's failure to substantially comply with a case plan as contemplated by La.Ch.Code art. 1015(6), La.Ch.Code art. 1036(C) states:

> C. Under Article 1015(6), lack of parental compliance with a case plan may be evidenced by one or more of the following:
>
> (1) The parent's failure to attend court-approved scheduled visitations with the child.
>
> (2) The parent's failure to communicate with the child.
>
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
>
> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
>
> (5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
>
> (6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
>
> (7) The persistence of conditions that led to removal or similar potentially harmful conditions.
>
> (8)(a) The parent's failure to provide a negative test result for all synthetic or other controlled dangerous substances, except for any drug

for which the parent has lawfully received a prescription, at the completion of a reasonable case plan.

The State is only required to establish one of these statutory grounds. *State ex. rel. ML*, 95-45 (La. 9/5/95), 660 So.2d. 830.

In *State ex rel. D.H.L.*, 08-39, pp. 4-5 (La.App. 3 Cir. 4/30/08), 981 So.2d 906, 910 (footnotes omitted), we discussed the State's burden of proof and our standard of review in connection with termination of parental rights proceedings as follows:

> Our supreme court has recognized that the gravity of terminating parental rights requires our courts to impose a stricter standard of proof than the preponderance of the evidence standard; rather, the State must prove by clear and convincing evidence at least one of the statutory grounds contained in La.Ch.Code art. 1015 in order to terminate a parent's rights. *See State ex rel. J.M.*, 02-2089 (La. 1/28/03), 837 So.2d 1247; La.Ch.Code art. 1035(A). **"Further, even upon finding that the State has met its evidentiary burden, a court still should not terminate parental rights unless it determines that to do so is in the child's best interests."** *State ex. rel. J.M.*, 837 So.2d at 1253; *see also* La.Ch.Code art. 1037(B).
>
> An appellate court cannot set aside a juvenile court's findings of fact regarding the termination of parental rights unless it is manifestly erroneous or unless those findings are clearly wrong. *In re A.J.F.*, 00-948 (La.6/30/00), 764 So.2d 47; *Rosell v. ESCO*, 549 So.2d 840 (La.1989).

(emphasis added.)

In *In the Interest of CLS*, 94-531, pp. 5-6 (La.App. 3 Cir. 11/2/94), 649 So.2d 532, 536 (internal citations omitted), we explained:

> Proof by clear and convincing evidence requires a party to persuade the trier of fact that the fact or causation sought to be proved is highly probable, i.e. much more probable than its non-existence. This burden is an intermediate one between the burden of proof by a preponderance of the evidence and the burden of proof beyond a reasonable doubt. Proof by clear and convincing evidence requires more than a "preponderance" of the evidence, the traditional measure of persuasion, but less than "beyond a reasonable doubt," the stringent criminal standard.

Thus, for termination of parental rights under La.Ch.Code art. 1015(6), the State was required to prove by clear and convincing evidence that (1) Z.S.J. was in

the State's custody for at least a year; (2) T.J. did not substantially comply with the court-approved case plans; and (3) there is no reasonable expectation of T.J.'s significant improvement in the future. In addition, even if the State met this burden, termination of T.J's parental rights must be in Z.S.J.'s best interest.

**Substantial Compliance with the Case Plan:**

In her first assignment of error, T.J. argues that the trial court erred in finding clear and convincing evidence establishing she failed to substantially comply with her case plan. We agree.

We first note that all case plans in the record through October 2016, which were submitted in connection with the six-month review hearings, expressly stated that T.J. had completed and/or was in compliance with her case plan goals and she had developed a bond with Z.S.J. It was not until April 2017 that the trial court changed the case plan goal to adoption. This came immediately after T.J.'s high risk pregnancy and birth of her sixth child, who was born with disabilities, and T.J.'s associated medical restrictions through January of 2017, which hindered her ability to travel from Alexandria to Shreveport to visit with Z.S.J. and attend his medical appointments.

*Parental Support:*

The trial court concluded that T.J. failed to provide support as ordered by the court-approved case plans. It found that she had paid a total of $85 over nine years, and that T.J.'s purchases of gifts or supplies for Z.S.J. were irrelevant because "she was aware of this requirement of the case plan." This finding is not supported by the record.

A majority of the case plans through March 2017, including the March 2017 case plan, expressly reflected that while T.J. had not directly submitted a monthly

22

support payment, she had provided, or attempted to provide food, clothing, and other supplies to Z.S.J. or his caretaker; and again, each of the plans through September 2016 reflected T.J's general compliance with case plan goals. Further, the March 2017 case plan expressly indicated that the support obligation was "completed." Therefore, there is not clear and convincing evidence in the record to support a finding that T.J. did not comply with the parental support obligation through March 2017.

The March 2017 case plan, which was approved by the trial court at the review hearing in April 2017, required T.J. to provide support to Z.S.J. "in the form [of] monetary contributions, that will be need to be verified, **and other daily needed items**." (emphasis added). At the time of the termination hearing, she had paid a total of $85. In addition, the September 2017 case plan documented that T.J. had supplied Z.S.J. with a book bag, lunch box, and tennis shoes during the August 2017 visit. The February 2018 case plan also documented that T.J. had brought supplies for Z.S.J. to scheduled visits, but because the Shreveport office failed to make the child available for the visits, she was unable to provide the supplies to him.

Therefore, according to the March 2017 case plan, which was not approved until April 2017, T.J. owed a total of seven months of parental support, or $170 through the termination hearing in September 2018, and that was to be in the form of monetary payments and supplies. Given that she paid half of that amount, as well as provided, or attempted to provide, supplies to Z.S.J., we find that the record lacks clear and convincing evidence of T.J.'s "failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan[,]" as required by La.Ch.Code art. 1036(C)(4). Therefore, the trial court was manifestly

23

erroneous in finding that T.J. failed to substantially comply with her case plan by failing to provide financial support.

*Visitations:*

Clear and convincing evidence of a "parent's failure to attend court-approved scheduled visitations with the child" is also a ground upon which a court may find that a parent failed to substantially comply with a case plan and terminate parental rights. La.Ch.Code. art. 1036(C)(1); *see also*, La.Ch.Code art. 1015(6). The trial court found T.J. did not comply with the visitation component of her case plans, noting her inconsistency over the years, and stating "as a result, no evidence was presented to the [c]ourt that she has a strong enough bond with [Z.S.J.] to be reunited with him at this time."

At trial, Ms. Carpenter, who was not Z.S.J.'s caseworker until November 2016, testified that over the nine years Z.S.J. had been in the State's custody, T.J. had 177 opportunities to visit with Z.S.J., and only did so 39 times. According to Ms. Carpenter, her calculations were based upon her notes that are not otherwise in the record, and the State's policies that allow bi-monthly visitations when the case plan goal was reunification, and monthly visitations when the goal was adoption. However, this testimony is inconsistent with the court approved scheduled visitations and case plans in the record.

The October 2010 case plan provided for monthly visitations at Holy Angels in Shreveport, with the State transporting T.J. to the visitations. The September 2012 case plan following Z.S.J.'s transition to a foster home stated that visitations were monthly and would alternate between Bossier City and Alexandria. Per the September 2013 case plan, visitations were changed to weekly, and took place on Mondays in Shreveport. The March 2014 case plan reflected that the State would

24

no longer provide weekly transportation, and provided that the State would transport T.J. on the third Thursday of each month, and T.J. would transport herself on the first Monday of each month. This schedule remained the same in the September 2014 case plan.

Beginning with the March 2015 case plan, which was approved in April 2015, no specific court approved visitation schedule was in place. While the September 2015 case plan suggested that during the April 2015 hearing, T.J. was allowed to have unsupervised visits that would be coordinated through the case workers and caretaker, no such order appears in the record. The September 2015 case plan also reflected that visitation was to be coordinated through the State's caseworkers and Z.S.J.'s caretaker, but no specific court-approved schedule is in the record.

Then, pursuant to the March 2016 case plan, approved in April 2016, visitation was to take place on the third Wednesday of each month at a McDonald's in Shreveport. This remained in place until the September 2016 case plan was approved by the trial court in October 2016.

We note, again, that the State's case plans through September 2016 reflected T.J.'s general completion of case plan requirements, despite any missed visitations that may have occurred during this time. Ms. Carpenter's unsubstantiated testimony directly conflicts with the State's case plans that are in the record through this date and cannot constitute clear and convincing evidence establishing T.J.'s failure to comply with visitation through September 2016.

No specific visitation plan was included in the September 2016 case plan or otherwise approved by the trial court. While a report filed by the Alexandria office suggested it was awaiting a weekly visitation agreement from the Shreveport office, no such agreement appears in the record. In the months following the September

25

2016 case plan, according to the State's records in evidence, T.J. had medical restrictions due to a high risk pregnancy and birth of her sixth child, who also has special needs, and T.J. was not medically released until January 2017. While the March 2017 case plan reported that T.J. missed visitations and appointments during this time, it is unclear how many, given the lack of any specific approved schedule or documented appointments in the record. However, the March 2017 case plan also reported that following T.J.'s medical release in January 2017, visitations began every Thursday thereafter.

The record contains multiple case plans dated March 2017. Attached thereto are three different visitation plans; one suggesting that T.J. visits when she can, and the other two reflecting that visitation was to occur weekly. There is no indication in the record as to which case plan or visitation schedule was approved by the trial court.

In accordance with the March 2017 case plan, the goal was changed to adoption by the trial court following the April 2017 hearing. Thereafter, T.J. visited Z.S.J. in April 2017, as well as in August 2017. No visitations occurred in May, June, or July 2017, according to the September 2017 case plan; however, the record is unclear when those visits were scheduled and what notice was given to T.J.

Beginning with the September 2017 case plan, visitation was to take place once per month as scheduled by the Shreveport office. According to a report filed by the Alexandria office in connection with the April 2018 review hearing, T.J. visited with Z.S.J. in November 2017. However, in September, October, December, and February 2018, T.J. attempted to visit, but the Shreveport office did not make Z.S.J. available. This was confirmed by Ms. Carpenter's testimony during the termination hearing.

26

Ms. Carpenter also testified that in March 2018, visitation was cancelled by all parties because of flooding; in April 2018, visitation occurred in court and then at McDonald's following the review hearing; T.J. could not attend a visit on May 31, 2018, because her youngest child with special needs was in the hospital; a family visit occurred June 28, 2018; and T.J. was not able to attend a visit in July 2018 because of an employment commitment. There is no specific evidence in the record establishing when the Shreveport office had scheduled the visits that T.J. was unable to attend, or when T.J. was notified of the visits.

Given the case plans' indication that T.J. was compliant therewith through the September 2016 case plan, the record's lack of a specific court-approved visitation schedules in place after September 2016, and the evidence establishing that the Shreveport office failed to make Z.S.J. available for visitation on multiple occasions, we find that the trial court was manifestly erroneous in finding clear and convincing evidence that T.J. failed to attend court-approved scheduled visitations as contemplated by La.Ch.Code art. 1036(C)(1), or that T.J.'s missed visitations under the circumstances otherwise constituted a failure to substantially comply with her case plan.

*Training:*

The trial court also concluded that T.J. failed to complete the case plan with respect to "[t]raining to care for her special needs child," stating that, "[i]n nine years, she did not attend enough doctors['] visits to receive the training" and "has yet to receive the training needed to handle him safely."

There is no question that T.J. must be able to demonstrate an ability to properly care for Z.S.J. before he can be reunited with her. However, the issue before us at this time is not whether reunification is appropriate, but rather whether

27

T.J. substantially complied with the various case plans' requirements with respect to this area. Therefore, we will begin the analysis with the related requirements of the case plans themselves.

Beginning with the October 2010 case plan, which is the first case plan in the record, there were no specific plan requirements regarding the "[t]raining to care for her special needs child." Rather, it required T.J. to maintain a safe and stable home, financially provide for her children, remain in contact with the State, develop a support system, apply for appropriate financial assistance, and provide financial support. The State's records in evidence also reflect that T.J. successfully completed parenting classes early on in the case.

While the general goals of the October 2010 case plan remained the same through 2013, the trial court's judgment from the April 2013 review hearing ordered the State to assist T.J. in obtaining counseling to address the comprehensive care Z.S.J. needed. According to the case plans in the record, T.J. regularly attended counseling with Ms. Redding in Shreveport through October 2013. However, T.J., who resided in Alexandria, thereafter became pregnant with her fifth child and suffered a difficult high risk pregnancy. This prevented her from traveling to Shreveport to visit with Z.S.J. or participating in therapy with Ms. Redding through August 2014.

Meanwhile, however, according to the March 2014 case plan, the State decided to no longer provide weekly transportation, but rather, would only transport her once per month, and required T.J. to transport herself on the first of the month. The September 2014 case plan similarly reflected that visitation would take place at Ms. Redding's office on the 3rd Thursday of the month, with the State transporting

T.J., and on the first Monday of the month, with T.J. responsible for transporting herself.

Beginning with the March 2015 case plan, Ms. Redding's office was no longer listed as the location for visitation, and appointments with her were not specifically required.

T.J.'s case plans did not have any specific requirements or goals regarding attaining medical knowledge until the March 2016 case plan, which added the goal of increasing her knowledge of care and related action step that required T.J. to attend all of Z.S.J.'s medical appointments. This same action step also required the State to adequately notify T.J. in advance of those appointments. The September 2016 case plan then added an additional action step requiring T.J. to learn how to maintain Z.S.J.'s feeding tube, as well as learn his medical needs, favorite foods, and daily schedule. However, the State was also required to seek out resources who could demonstrate the knowledge T.J. may need.

Shortly after these additional case plan requirements were added, T.J. gave birth to her sixth child, who has special needs, and she was placed on medical restrictions through January 2017. Noting T.J.'s inability to attend visitations and appointments during the sixth-month reporting period, the March 2017 case plan changed the goal to adoption. This was approved by the trial court in April 2017. While the March 2017 case plan indicated that T.J. was invited to attend several appointments, there is no indication whether these appointments occurred prior to, or after, her medical release.

The action steps regarding attending medical appointments and obtaining training were removed from the March 2017 case plan. Instead, the behavior goal was stated generally as "demonstrating adequate skills to fulfill the role as a

29

caregiver," and the related action step required her to "continue to exhibit appropriate parenting skills." The plan also required for the foster parent to be present to update T.J. on Z.S.J.'s medical and daily needs.

The September 2017 case plan reinserted the previous action steps related to medical appointments and training that had been omitted from the March 2017 plan. During the next six-month period, the Alexandria office was made aware of one medical appointment that occurred the same day that notice was given, according to a report filed by the Alexandria office in April 2017. The report also noted T.J.'s significant efforts to obtain training on her own, but that her efforts were futile, and she was told she would need day-to-day practice to learn what Z.S.J. required.

The February 2018 case plan indicated that T.J. was not informed of any medical appointments that occurred during the six-month reporting period, and that T.J. tried to obtain Z.S.J.'s medical records and enroll in PEG tube training classes, but to no avail.

Based upon the record, we conclude that the trial court was manifestly erroneous in concluding that there was clear and convincing evidence of T.J's failure to comply with the "[t]raining to care for her special needs child" requirement of the case plan. We again note that every case plan through September 2016 reflected that T.J. successfully completed and/or complied with her case plan goals, despite any medical appointments she may have missed. Therefore, we have no reason to conclude otherwise.

We further note there is little evidence to indicate that the State adequately provided T.J. with advance notice of medical appointments, or sought out resources to assist T.J. in attaining medical knowledge, as required by the 2016 case plans. Ms. Carpenter testified that when she would contact the Shreveport office, she was not

always afforded the appointment dates in adequate time to notify T.J. Ms. Carpenter also indicated that she had emailed the Shreveport office approximately six times requesting appointment dates, but her emails went unanswered. Also according to Ms. Carpenter, during a family team meeting, a Shreveport worker asked why T.J. needed to know about the appointments when the goal had been changed to adoption. Ms. Carpenter also indicated that Z.S.J. had not had any appointments in the five months preceding the termination hearing, and that there were five appointments over the last two years, two of which T.J. attempted to make, but was late for. There is no further information in the record regarding when these appointments were, the nature of the appointments, or when T.J. was notified of them.

Ms. Hunt testified generally that she would email appointment calendars to the Alexandria office or otherwise communicate appointment dates in writing during family team meetings. However, there are no corroborating emails in the record or otherwise any indication in the case plans from the family team meetings that any appointment dates were provided.

With respect to the training requirement, which was not added to the case plan until the September 2016, we first note that the record establishes that many obstacles have interfered with T.J.'s ability to obtain and demonstrate appropriate care for Z.S.J., both before and after this time. T.J. has resided in Alexandria since before Z.S.J.'s birth. However, Z.S.J. has continuously resided several hours away in Shreveport, even after he was discharged from the Holy Angels facility. No certified medical documentation or expert medical testimony was presented at the termination hearing in September 2018 suggesting that maintaining Z.S.J.'s residence in Shreveport through the time of the hearing was medically necessary, much less what Z.S.J.'s current medical condition was, or whether addressing his

31

medical needs required specific training. The foster parent, Y.D., testified only to Z.S.J.'s daily routine,[6] and was not otherwise accepted as an expert medical witness. We also note T.J.'s testimony that at one point she was advised by her caseworker not to move to Shreveport because she did not have a support system there.

Further, T.J. has given birth to two other special needs children since Z.S.J.'s birth, which resulted in medical restrictions beyond her control preventing her from travelling to Shreveport to visit or attend appointments. Her last special needs child was born during the time, or shortly after, the specific case plan requirements regarding attending medical appointments and obtaining training were added for the first time, rendering those case plan action steps nearly impossible while T.J. was pregnant, recovering from birth, and tending to her baby's special needs. After T.J. was medically released, the case plan goal was changed to adoption due to her failure to attend medical appointments and obtain training.

In addition, two separate State offices oversee this case, one in Shreveport and one in Alexandria, and multiple caseworkers have been involved over the years. The testimony, case plans, and reports from the two offices clearly reflect a lack of adequate communication and organization between the offices, and especially since 2016, when the specific requirements regarding training and medical appointments were added to the case plan.

Despite these obstacles, and despite the fact that the case plan goal had been changed to adoption shortly after the medical appointments and training requirements were added to the case plan, both Ms. Carpenter's testimony and the

---

[6] Y.D. testified that Z.S.J.'s daily routine included transferring him in and out of his wheelchair, dressing and diapering him, assisting him with physical therapy exercises and the "stander", giving him his medicine and occasionally feeding him through the PEG tube, assisting him with eating by mouth, transporting him to and from school and appointments, and monitoring him for seizures.

Alexandria office's reports submitted in connection with the April 2017 and April 2018 review hearings indicated significant effort on the part of T.J. to obtain training concerning Z.S.J., even though those efforts were not successful.

We therefore conclude that the trial court was manifestly erroneous in finding that T.J. failed to substantially comply with the training component or her case plan, or otherwise failed to substantially comply with her case plan as contemplated by La.Ch.Code art. 1015(6).

***Reasonable Expectation of Improvement***

The State was also required to prove by clear and convincing evidence that "there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home." La.Ch.Code art. 1015(6). The trial court found that this requirement was met, stating only, "The case is nine years old. There is no reasonable expectation for improvement."

We find that the trial court was manifestly erroneous in concluding that the State sufficiently proved this element of La.Ch.Code art. 1015(6). The duration of this case, alone, is insufficient. Rather, the record is replete with evidence of T.J.'s progress, despite the aforementioned obstacles she faced. Each case plan through September 2016 reflected her compliance with case plan goals. In addition, the April 2015 ruling from the trial court expressly stated that T.J. was "complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child(ren) to be in care." The State's report submitted in connection with the October 2015 review hearing, as well as the September 2015 case plan, reflected T.J's maturity since Z.S.J.'s entrance into foster care and her "tremendous progress" in decision making.

33

Despite the March 2017 case plan goal being changed to adoption, it reported T.J.'s ability to love and nurture her children and provide appropriate care for the five children in her home, two of whom have special needs. Thereafter, T.J. made efforts to attend visitations and medical appointments; however, the record reflects that the Alexandria office was not timely made aware of appointments, and the Shreveport office did not make Z.S.J. available for visitations. In addition, T.J. attempted to obtain Z.S.J.'s medical records and schedule training on her own, but to no avail. Rather, she was told that the training needed for Z.S.J. was day-to-day practice; however, she has not been given an opportunity to have this sort of practice with Z.S.J.

Therefore, we conclude that the trial court was manifestly erroneous in finding the State satisfied its burden of proving the elements of La.Ch.Code art. 1015(6).

### *Best Interest of the Child*

On appeal, T.J. also argues that the trial court erred in concluding that termination of her parental rights was in the best interest of Z.S.J. We agree. T.J.'s case plans in the record through the October 2016 hearing specifically reflect the bond that T.J. had established with Z.S.J. There is evidence that Z.S.J. has called T.J. "momma" and enjoys his visits with his mother. In addition, the March 2017 case plan noted that T.J.'s other children are bonded to one another and to Z.S.J. Also, Z.S.J. reportedly recognized his grandmother during a "facetime" call that took place during the August 2017 visit. A report submitted by the Alexandria office also reflected that during the November 2017 visit, Z.S.J. seemed to enjoy his time with his mother.

We also note that while Y.D. has been Z.S.J.'s foster parent since December 2012, she did not expressly indicate that she desired or otherwise intended to

adoption Z.S.J. when asked her intentions at the termination hearing. Rather, she testified generally that she would care for Z.S.J. as long as he needed her.

Therefore, given the totality of the evidence in the record, we conclude that termination of T.J.'s parental rights is not in Z.S.J.'s best interest at this time.

## CONCLUSION

For the reasons set forth above, we reverse the ruling of the trial court, and render judgment in favor T.J. dismissing the State's claims against her seeking the termination of her parental rights as to Z.S.J.

**REVERSED AND RENDERED.**